IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SHONDELL KILLEBREW,

                        Plaintiff,

  v.                                                   OPINION & ORDER

HANS KUSTER and TIM IKERT,                    15-cv-52-jdp

                        Defendants.

---

Plaintiff Shondell Killebrew, a Milwaukee resident formerly incarcerated at the Oshkosh Correctional Institution, brings Eighth Amendment and state-law negligence claims against defendants Hans Kuster and Tim Ikert for failing to do anything to fix the cold temperatures Killebrew was forced to endure in his cells. Each side has filed a motion for summary judgment. Dkt. 32 and 34. After considering the parties' submissions, I conclude that Killebrew fails to provide evidence showing that defendants were deliberately indifferent to a serious risk of harm from the temperature in his cells, and that Killebrew failed to comply with the notice-of-claim statute for his negligence claims. I will deny his motion for summary judgment, grant defendants' motion, and dismiss the case.

FINDINGS OF FACT

I draw the following facts from the parties' summary judgment submissions.[1]

---

[1] I gave the parties extra time to respond to each other's summary judgment motions after Killebrew withdrew a motion to voluntarily dismiss the case. But Killebrew did not respond to defendants' proposed findings, and he did not file formal proposed findings of fact, so defendants did not file responsive findings. Construing Killebrew's pro se filings liberally, I glean his version of the facts from his brief, which tracks his version of events in his verified complaint.

Plaintiff Shondell Killebrew is currently a Milwaukee resident, but at the times relevant to this lawsuit, he was an inmate at the Oshkosh Correctional Institution (OCI). Defendant Hans Kuster is a captain at OCI. Defendant Tim Ikert is the building and grounds superintendent at OCI.

This case concerns the temperature of Killebrew's cells in the Restrictive Housing Unit (RHU) at OCI. Defendants explain that the RHU is what was formerly referred to as the segregation unit. Killebrew was initially moved there on October 10, 2014, because of a conduct report filed against him. While he was in "temporary lockup status" that day, he made threats of self-harm, so he was moved to observation status in cell 102, near the officers' station on the north side of the building.[2] On October 13, he was moved out of observation to cell 28, which was on the part of the south tier closest to the middle of the unit, also close to the officers' station. Killebrew stayed in cell 28 until November 7, 2014, when he was moved to another building.

All inmates in RHU are provided the same amount of clothing except for inmates in observation or control statuses. In observation status, clothing and property is determined by psychological unit staff. Beginning on October 13, 2014, Killebrew was in an RHU segregation cell and not on observation or control status. Inmates in RHU status are issued one pair of socks, one pair of undershorts, one t-shirt, one orange shirt, one pair of orange pants, and one pair of soft-soled shoes. All non-control-status or non-observation-status inmates in RHU are also provided two blankets along with their bedding. Property for inmates in observation or control status is determined on a case-by-case basis. Defendants

---

[2] Defendants submit a layout of the "S Building" that shows the location of each cell.

also state that it is RHU practice to provide inmates with an additional heavy "wool-like" blanket from October to April.

The RHU temperature is controlled by a computerized, automated heating system. The RHU is divided into heating zones containing four to five rooms. Air handlers supply 65-degree air to each zone, and booster coils adjust the temperature according to pre-set temperature points for each zone. In October and November 2014, the pre-set temperature for each zone in the segregation building at Oshkosh Correctional Institution was 71 degrees.

If an inmate's cell is not the proper temperature, the inmate should advise security staff. Staff will take the temperature in the inmate's room. If the thermometer reads between 68 to 72 degrees, the room is within the normal temperature rage. If the temperature does not fall within that range, staff will submit a work order.

Sean McWane (the "HVAC/Refrigeration Specialist-Advanced" at OCI, who is not a defendant in this case) has a computer in his office showing a layout of each building, the pre-set temperatures, and the actual temperatures of each zone. McWane receives an "alarm/notification" if a temperature drops below 68 degrees or above 79 degrees. McWane does not recall receiving an alarm in October or November 2014.

Killebrew states that he was "subjected to incessant frigid temperatures." Dkt. 32, at 3. Killebrew says that he told defendant Kuster about the problem on October 10, 2014, by explaining that the temperature made the pieces of metal lodged in his back cold (he has bullet fragments in his back from being shot years ago and continues to suffer from numbness and weakness in his legs and, to a lesser degree, his hands) and "would eventually leave [him] in pain." *Id*. Kuster says that he had a conversation with Killebrew at some point while he was in observation in cell 102, and that Killebrew said that his feet were cold. Kuster says

3

that he responded by telling Killebrew that, because of his observation status, Killebrew would have to talk to the psychologist about getting a blanket. The parties do not explain if they are referring to the same conversation.

Killebrew says he brought the issue up again at his October 14 disciplinary hearing before Kuster and Ikert (by this point, Killebrew was out of observation status and in an RHU segregation cell), stating that the temperature was starting to cause him pain, but Kuster told him that it was not the proper time to raise the issue. Killebrew also states that he filled out an "Interview/Information Request" form addressed to Ikert on October 14, stating, "I have address[ed] this to you in regard to the inhuman conditions of the cold showers and temperatures in the cell and is wondering what's going on?" Dkt. 32-2. Killebrew says that he never heard back from Ikert.

Killebrew says that he and other inmates "filed complaints and continued to verbalize the extreme cold that we were wantonly subjected to," Dkt. 32, at 3. But to whom these complaints were made, he does not say. On October 31, Correctional Sergeant Jason Mentzel (who is not a defendant) came to check the temperature. According to Killebrew, Mentzel said that the temperature was 78 degrees in the hallway. Inmates told Mentzel to measure the temperature in one of the cells. "Not even 5 minutes later," Mentzel retrieved the thermometer and stated that the temperature was 64 degrees. *Id*. at 4.

Defendants' version of the events is as follows: On October 31, Mentzel responded to the complaint an inmate housed on the south tier near Killebrew. Mentzel brought a thermometer to an empty cell in the area and left it there for 15 minutes. Mentzel does not recall the precise reading of the thermometer, but he does remember that the temperature was under 68 degrees. Mentzel contacted maintenance. The heat was adjusted by

4

maintenance immediately, by adjusting the dampers to make the cells warmer until the system could be properly reset. Approximately one hour after the work was completed, the inmates told Mentzel that their cells were at an acceptable level. Later that evening, an inmate on the north side of the building said that his cell was cold, so Mentzel wrote a work order for maintenance staff to check the north side when they were performing repairs to the south side. That as the only work order in the prison records related to temperature for October and November 2014. On November 3, 2014, a response to the work order was issued, stating "Reset tripped pump. Operational Ok." That pump was in a different location, involving a different air handler, from where Killebrew was located.

Based on his personal observations, defendant Kuster believes that during October and November 2014, the temperature in the south tier of the RHU was at or around the set temperature of 68 to 72 degrees. He does not remember ever feeling uncomfortable, or wearing anything other than his usual work uniform.[3]

Killebrew was seen by nursing and psychiatric staff at least ten times in October and November 2014, but they noted no complaints from Killebrew about his cell being cold or about physical symptoms from being cold.

ANALYSIS

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of

---

[3] Defendants submit additional proposed findings about Killebrew failing to raise the temperature concerns in meetings with medical and psychological staff, and about him failing to raise these concerns in the health service requests he filed about other issues. But those findings are not complete because the exhibits they cite to support them were not included in defendants' evidentiary materials. I cannot consider those unsupported findings.

law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must be drawn in the nonmoving party's favor. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). If the nonmoving party fails to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the moving party is proper. *Celotex*, 477 U.S. at 322.

### A. Eighth Amendment

The Eighth Amendment requires the government to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). Conditions of confinement that expose a prisoner to a substantial risk of serious harm are unconstitutional. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

To demonstrate that prison conditions violated the Eighth Amendment, a plaintiff must allege facts that satisfy a test involving both an objective and subjective component. *Farmer*, 511 U.S. at 834. The objective analysis focuses on whether prison conditions were sufficiently serious so that "a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities," *id.*, or "exceeded contemporary bounds of decency of a mature, civilized society." *Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994). The subjective component requires an allegation that prison officials acted wantonly and with deliberate indifference to a risk of serious harm to the plaintiff. *Id*. "Deliberate

6

indifference" means that the defendant knew that the plaintiff faced a substantial risk of serious harm and yet disregarded that risk by failing to take reasonable measures to address it. *Farmer*, 511 U.S. at 847. Thus, it is not enough for the plaintiff to prove that a defendant acted negligently or should have known of the risk. *Pierson v. Hartley*, 391 F.3d 898 (7th Cir. 2004). He must show that the official received information from which an inference could be drawn that a substantial risk existed and that the official actually drew the inference. *Id*. at 902.

Prisoners have a right to "protection from extreme cold." *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997). For Eighth Amendment claims based on low cell temperature, courts examine factors such as "the severity of the cold; its duration; whether the prisoner has alternative means to protect himself from the cold; the adequacy of such alternatives; as well as whether he must endure other uncomfortable conditions as well as cold." *Id*. at 644.

For Killebrew to defeat defendants' motion for summary judgment on his Eighth Amendment claims, he has to set forth facts that could lead a reasonable jury to conclude two things: (1) he faced a substantial risk of serious harm from the cold; and (2) defendants were aware of it yet chose not to help him. For him to prevail on his own motion for summary judgment, the facts need to show that no reasonable jury could conclude anything other than that he faced the risk of harm and that defendants were deliberately indifferent, meaning that there does not need to be a trial because no jury could reasonably find for defendants.

The facts here fall far short of conclusively demonstrating that defendants violated the Eighth Amendment. So I will deny Killebrew's own motion for summary judgment. The question whether Killebrew has provided enough evidence of deliberate indifference to get to trial is a closer call.

Killebrew adequately places in dispute whether defendants were aware of his complaints about the temperature of his cells. He says that he spoke with Kuster twice about the problem and sent an interview request form to Ikert. Neither Kuster nor Ikert took action on Killebrew's statements. I also conclude that it is undisputed that the cells were not at 68 to 72 degrees for at least part of the time. Defendants concede that a cell near Killebrew's was below 68 degrees on October 31, 2014, and that there was some maintenance work performed on both the south and north tiers around that time in response to complaints of cold cells.

But that does not mean that Killebrew actually faced an objective risk of substantial harm, or that were deliberately indifferent to that risk. To start with, there is the question about what a reasonable jury could conclude the temperature actually was in Killebrew's cells. Killebrew is quite vague about how cold it really got. He calls the temperatures "frigid" and "inhumane," but those are subjective terms that have to be taken into context with the other undisputed facts. The only objective measurement taken of Killebrew's area during the month in question was on October 31, 2014, when Mentzel obtained a reading of 64 degrees Fahrenheit.

In my order screening Killebrew's complaint, I stated that "[f]rom these allegations it is difficult to tell whether [Killebrew] is saying the cell temperature was 64 degrees, or that the thermometer reading would have continued to drop had it been left in the cell." Dkt. 12, at 2. Nothing in Killebrew's summary judgment materials makes his version of the facts clearer now. In his brief, he states, "Seeing that the temperature had rapidly dropped 14 degrees within a 5 minute period along with the inclement weather outside (being at or near

8

below zero) constitute inhumane condition," Dkt. 32, at 4.[4] From this statement, I cannot tell whether this means Killebrew is saying the temperature was actually lower than 64 degrees. But later in his brief he says " . . . the temperatures were found to be in the mid 60's [less than state standards] . . . ," Dkt. 32, at 6 (brackets in original), and in his November 2014 inmate grievance about the problem, he stated that Mentzel saw "that the [temperature] in the corridor (78°) was a lot higher than the [temperature] in our cells (64°)," which seems to show that Killebrew agrees with the 64-degree reading. And nothing in his materials suggests that the cell temperature on October 31 was different from the rest of the month. Because it is Killebrew's burden to establish the objective serious risk of harm to prove his Eighth Amendment claim, I conclude that he has at best shown that the temperature was about 64 degrees.

This is insufficient to maintain an Eighth Amendment claim against defendants. Killebrew states that the temperatures were below "state standards," which is true: defendants say that if the temperature drops below 68 degrees, the HVAC system's alarms go off and maintenance looks into the problem.[5] But violations of this standard do not in themselves violate the United States Constitution. *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) ("[Section] 1983 protects plaintiffs from constitutional violations, not

---

[4] Defendants say that they do not remember the weather being particularly cold that month. My own research into public weather data suggests that it did not get as cold as Killebrew says: a search of the weather history at the Oshkosh airport shows a low of 24 degrees during the month. *See* https://www.wunderground.com/history/airport/KOSH/. In any event, the actual temperature outside is irrelevant for purposes of this opinion because any normal late-autumn weather in Oshkosh would likely be cold enough to require the heat to be turned on. The important question is how cold the cells actually were, not how cold it was outside.

[5] The alarm system apparently did not catch the 64-degree temperature in the RHU cell as measured by Mentzel, however.

violations of state laws or, in this case, departmental regulations and police practices." (quotations omitted)).

A temperature in the mid-60s is not as severe as the cold temperatures that courts of this circuit have previously determined could support an Eighth Amendment claim. *See, e.g.*, *Dixon*, 114 F.3d at 643 (temperature averaged about 40 degrees and ice formed on interior walls of cell); *Henderson v. DeRobertis*, 940 F.2d 1055, 1057-58 (7th Cir. 1991) (heating system failure and broken windows led prison temperatures to fall below freezing; "'it was cold enough to see your breath.'"); *Lewis v. Lane*, 816 F.2d 1165, 1171 (7th Cir. 1987) ("Lewis' affidavit, which accompanied the *pro se* complaint, claimed that the temperature at times fell to between 52 and 54 degrees."); *compare with Armstrong v. Brann*, No. 04-C-0884, 2006 WL 3422570, at *6 (E.D. Wis. Sept. 25, 2006) (The temperature in the jail was between 65 and 68 degrees, and never lower than 60. . . . Based on the foregoing, it does not appear that the cold temperatures in the plaintiff's cell, in isolation, constitute a sufficiently serious deprivation.").

And it is not just the temperature that determines whether the conditions violate the Eighth Amendment. Many cold-cell cases involve prisoners being placed in cells with no clothing or bedding. *See, Murphy v. Walker*, 51 F.3d 714, 721 (7th Cir. 1995) ("Murphy's contention that he was confined to a cold cell without clothes and heat in the middle of November is a sufficient allegation of inadequate heat and shelter."); *Gillis v. Litscher*, 468 F.3d 488, 490 (7th Cir. 2006) (prisoner forced to sleep naked in cold cell had to walk around 14 hours a day to keep warm). For all but the first three days of his time in the RHU, Killebrew received the standard clothing and bedding given to the segregation inmates there, which included two blankets and a thicker winter blanket. Given the relatively tolerable

temperature in the cells and the items prisoners had in their cells to help them stay warm, I conclude that a no reasonable jury could conclude that defendants were deliberately indifferent to a serious risk of harm to Killebrew. *Dixon*, 114 F.3d at 644 ("It is of course true that just because low temperature forces a prisoner to bundle up indoors during the winter does not mean that prison conditions violate the Eighth Amendment.").

In the argument section of his brief, Killebrew says that he ended up having "excruciating" pain, in his back, legs, feet, and hands, and that the cold exacerbated his numbness and weakness from his old injury. But he does not say that he told defendants about this amount of pain. And given that his symptoms are connected to his medical problems, the appropriate place to have forwarded concerns about his medical condition would have been to medical staff, but there is nothing in the record suggesting that Killebrew raised these concerns to medical personnel, nor is he proceeding on claims against medical staff. The non-medical prison official defendants in this case were tasked with making sure the cells were reasonably warm, not treating Killebrew's medical problems. Accordingly, I will grant defendants' motion for summary judgment on this claim.

**B. Negligence**

Killebrew also brings negligence claims against defendants under Wisconsin law. I will retain jurisdiction over this claim because it clearly has no merit and it would be inefficient to leave it open for a later state court action. *See Korzen v. Local Union 705*, 75 F.3d 285, 288-89 (7th Cir. 1996) ("The normal practice of course is to relinquish jurisdiction over a supplemental claim when the main claim is dismissed before trial, but if the supplemental claim is easily shown to have no possible merit, dismissing it on the merits is a time saver for everybody.").

As defendants point out, these state-law claims are doomed because Killebrew did not comply with Wisconsin's notice-of-claim statute, Wisconsin Statute § 893.82. Under this statute, a plaintiff must give notice to the state about the circumstances of his claims before suing state officials under state-law theories. Killebrew did file a notice of claim about his cold cell, but he did include the names of defendants in it, identifying only Sgt. Mentzel. *See* Dkt. 47-1.

Section 893.82(3) states:

> Except as provided in sub. (5m), no civil action or civil proceeding may be brought against any state officer, employee or agent for or on account of any act growing out of or committed in the course of the discharge of the officer's, employee's or agent's duties . . . unless within 120 days of the event causing the injury, damage or death giving rise to the civil action or civil proceeding, the claimant in the action or proceeding serves upon the attorney general written notice of a claim stating the time, date, location and the circumstances of the event giving rise to the claim for the injury, damage or death *and the names of persons involved, including the name of the state officer, employee or agent involved*. . . .

(Emphasis added.)

This is fatal to Killebrew's negligence claims because a plaintiff must strictly comply with the notice-of-claim statute to proceed with his claim. Section 893.82(2m) ("No claimant may bring an action against a state officer, employee or agent unless the claimant complies strictly with the requirements of this section."); *Kellner v. Christian*, 197 Wis. 2d 183, 194-95, 539 N.W.2d 685, 689-90 (1995) ("We read [subsection (2m)] to indicate that a claimant must adhere to each and every requirement in the statute."). This includes identifying the state officials who violated the plaintiff's rights. *Protic v. Castle Co.*, 132 Wis. 2d 364, 369, 392 N.W.2d 119, 122 (Ct. App. 1986); *abrogated on other grounds by Bicknese v. Sutula*, 2003

WI 31, 260 Wis. 2d 713, 660 N.W.2d 289. Because Killebrew has not complied with the notice-of-claim statutes, I will dismiss his negligence claims.

ORDER

IT IS ORDERED that:

1. Plaintiff Shondell Killebrew's motion for summary judgment, Dkt. 32, is DENIED.

2. Defendants Hans Kuster and Tim Ikert's motion for summary judgment, Dkt. 34, is GRANTED.

3. The clerk of court is directed to enter judgment for defendants and close this case.

Entered March 27, 2017.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge